FREE, APPELLANT, *v.* LEVINSON, APPELLEE.*

---

*Motion to certify the record overruled (37725), December 19, 1962.

(No. 5535—Decided May 21, 1962.)

*Mr. Harry R. Illman* and *Mr. Walter J. Krasniewski*, for appellant.

*Mr. Harold C. Moan*, for appellee.

DEEDS, J. This appeal is on questions of law from a judgment entered in the Court of Common Pleas in favor of the defendant, appellee herein, notwithstanding the verdict of a jury in favor of the plaintiff, appellant herein. A motion for new trial filed by defendant was overruled by the trial court.

The parties will be referred to as plaintiff and defendant as they appeared in the trial court.

We are required to view the evidence received upon the trial and the facts in the record in the light most favorable to the plaintiff. *Ayers* v. *Woodard, Sheriff*, 166 Ohio St., 138.

The evidence pertinent in a consideration of this appeal is, in part, that on October 25, 1960, while plaintiff was seated in a Jeep automobile, headed in a westerly direction at the intersection of Adams and 20th Streets, waiting to make a left-hand turn, the Jeep automobile was struck from the rear by another automobile being operated in a westerly direction, causing plaintiff to be forced against the steering wheel and to the floor of the Jeep, as a result of which plaintiff sustained certain personal injuries; that a rear flashing signal was operating, which indicated that plaintiff intended to make a left-hand turn; and that no signal was sounded by the operator of the automobile which collided with the Jeep while same was at a standstill.

The issue determinative of this appeal is whether there is substantial evidence tending to establish that the defendant operated her automobile into collision with the Jeep automobile standing at the intersection, and that plaintiff sustained personal injuries and damage as the proximate result of such collision.

In reference to the identity of the defendant we quote from the testimony of the plaintiff in part as follows:

"Q. Calling your attention again to the date of October 25, 1960, you testified that you pursued this red sedan down Adams

Street. What were the weather conditions on that day? A. Clear and dry.

"Q. Were you able to observe the face of the party who was driving the automobile that you claim struck you? A. Yes, I was.

"Q. Where did you observe her? A. Driving the automobile.

"Q. Where was that? A. Both at the time that she struck me and again when I pulled alongside of her at Adams and Woodruff.

"Q. Did you have a clear unobstructed view of the facial features? A. Yes.

"Q. You saw the woman on that occasion? A. Yes, sir, I did.

"Q. Have you seen her since? A. Yes, sir.

"Q. Is the woman in court today? A. Yes, she is.

"Q. Who is that? A. The lady sitting at the table over there. (indicating)

"Mr. Illman: Let the record show that the defendant was indicated by the plaintiff.

"Q. Where else have you seen this woman? A. Eppes Essen.

"Q. Why did you go there? A. After I got out of the hospital I went down there to see if that was who struck me originally.

"Q. Is that the same woman you talked to or attempted to talk to on the date in question? A. Yes, sir."

We note here as being highly pertinent that the foregoing testimony of the plaintiff is direct positive evidence tending to establish the identity of the defendant as the person who was operating the automobile which collided with the Jeep automobile on the date claimed by plaintiff, not that the jury was bound to believe the testimony.

We quote further from the testimony of the plaintiff in reference to the injuries which he sustained as a result of the collision:

"Q. How did you feel following that accident of October 15th? A. Stiff for the first few days and then it was gone.

"Q. Did you have any headaches? A. Only for a day or so.

"Q. Did you miss any work? A. No, I didn't.

"Q. Did you take any medical attention from any physician? A. No, I didn't.

"Q. For that injury October 15th? A. No.

"Q. Now, following this incident of October 25th, what if anything did you do after the occurrence of this incident? A. After speaking to the officers and the way I was feeling, I was worried and called the doctor and he informed me he wished me to go to Riverside for x-rays.

"Q. Did you go? A. Yes, that evening.

"Q. What time? A. Approximately 7:00, 7:30.

"Q. Were x-rays taken? A. Yes.

"Q. What if anything followed thereafter? A. The intern examined me and he called my doctor and said he thought I should be admitted and the doctor had me admitted to Riverside that evening.

"Q. And you remained there how long? A. Until the end of that week.

"Q. Did you have occasion to talk to police officers after you were admitted to the hospital? A. Yes, the following morning.

"* * *

"Q. Now, did you see a physician while in the hospital? A. Yes, my doctor saw me every day.

"Q. What was your doctor's name? A. Dr. Herschel Mozen.

"Q. Were you treated prior to that at home by him? A. Not prior, no, sir.

"Q. What history did you give the doctor? A. I told him the pains; in other words, the numbness, chest pain, the lower back and neck area, and I told him about the accident of the 15th of the month and also about the 18th, prior to that when I had been mugged.

"Q. Did you after giving the history have an examination made by the doctor? A. He examined me and they put me through multiple tests at the hospital.

"Q. What did they do in the way of treatment? A. They had a corset on me for traction.

"Q. Can you describe that device in the hospital? A. Like a corset, fits across the hips and straps over the end of the bed with weights on it.

"Q. How long did you wear that contraption? A. Four days.

"Q. Then you were released from the hospital? A. Yes.

"Q. Did you experience any pain while you were undergoing that? A. About the same as I had prior to that.

"Q. What were your complaints in the hospital? A. Severe headaches, pain in my neck and shoulders, pain in my chest and lower section of my back and legs.

"Q. You didn't work the rest of that week, did you? A. No, I didn't.

"Q. How many days did you lose? A. Four and a half days at that time, and about four days after that.

"Q. What was your weekly pay? A. $115.00.

"Q. That was for how many days? A. Five and one-half.

"Q. Your earnings were $20.00 a day? A. Yes, sir.

"Q. What if anything did you do after you left the hospital, in regard to medical attention? A. Well, I went to Dr. Mozen once a week. He gave me shots and also gave me a prescription for pain tablets.

"Q. What were your complaints after leaving the hospital? A. About the same, the headaches, the stiffness of the shoulders and back and lower back pain, headaches that came and went and then the business of numbness, dizziness, legs and back numbness which developed.

"Q. What sensation? A. Like needles and pins.

"Q. Did you have that sensation after your accident of October 15th? A. No, sir. Not after October 15th.

"Q. Any of this numbness, those feelings after that October 15th accident? A. No, sir.

"Q. Did you have headaches after this accident of the 15th? A. Only for a day or so.

"Q. Were you in a pain-free condition after this alleged incident of October 15th? A. I would say so, as far as a normal person.

"Q. How long did you continue to see Dr. Mozen? A. Still under his care.

"Q. What are your present complaints? A. Still stiffness of the neck, upper back, numbness in the knees and legs alternately, and headaches that come and go and pain in the lower back."

The testimony of the plaintiff's attending physician considered most favorable to the plaintiff concerning injuries sustained by plaintiff as a result of the collision is as follows:

"Q. Doctor, after taking the history did you make an examination? A. I did.

"Q. And what did the examination consist of? A. A general appraisal of the patient's condition, pulse, blood pressure, respiration, temperature; examination of the head, eyes, ears, nose and throat, chest, heart and lungs, also extremities, abdomen, genital organs, rectal examination.

"Q. Did he make any complaint about his chest? A. He said that when he took a deep breath it was painful, that he had tenderness over the front of the chest.

"Q. Did he make any complaint as to how that occurred? A. He stated that this was the result of bumping his chest against the steering wheel.

"Q. Was this history helpful to you in making a diagnosis; does the history of the patient help you any in making that diagnosis? A. Yes, the nature of the accident or injury would make one look for certain specific types of injuries.

"Q. Are these complaints generally associated with rear end collisions?

"Mr. Moan: I object.

"The Court: Sustained.

"Q. Doctor, did you make an examination and make any objective findings specifically? A. Yes, I feel the tenderness over the sternum was an objective finding; the patient had some spasms and limitation of motion of the low back and he also had some spasm and limitation of the neck muscles.

"Q. Will you describe a spasm in lay terms? A. Spasm is a state of contraction of a muscle which results in the tightness or firm condition of the muscle which is ordinarily soft and supple.

"Q. How is spasm detected on examination? A. By palpation.

"Q. And what did you find? A. One finds that the spastic muscle is more prominent in outline, that it is firm and harder than one would ordinarily feel in the muscle.

"Q. Can spasm be simulated or faked? A. I think not.

"Q. In other words, it is an involuntary reaction? A. Well,

it is a defensive mechanism as a result of an injury which prevents further motion of the part and is nature's method of splinting an injured structure.

"Q. Doctor, when you found this spasm was it on both sides of the vertebral column, did you notice, in his neck and back? A. Yes, I didn't find that one side was more prominent than the other. I felt it was apparent bilateral both in the neck region and in the low back region.

"Q. What did you prescribe for the patient? A. Well, the patient was placed on a firm mattress, he was given analgesics, muscle relaxants; we ordered the appropriate x-rays and blood work; we obtained a cardiogram, pulmonary function studies, sedatives; he was placed on intensive physiotherapic treatment and pelvic traction.

"Q. Will you describe pelvic traction for us? A. This is a type of therapy which applies a certain amount of pull to the hips and legs and is specifically utilized in the treatment of low back disorders.

"Q. Was that treatment continued under your direction for the plaintiff at the hospital? A. Yes, during the time he was in the hospital.

"Q. And did that assist the plaintiff in recovering to any extent? A. Yes, after the treatment had been in session for several days he stated he felt better and well enough to leave the hospital and he was dismissed.

"Q. Doctor, did the patient in giving you a history of an accident that happened ten days prior, what effect if any would a traumatic impact have upon the injuries or complaints of a prior condition—let me state it this way: would an impact aggravate any of the injuries received in a prior accident? A. Yes, I would say yes.

"Q. Doctor, what would be the extent of aggravation, if you can say?

"Mr. Moan: Objection.

"(Question withdrawn.)

"Q. Doctor, what is meant by the term 'aggravation'? A. The term has several meanings. I think in the present context one would consider an additive effect or perhaps one injury upon another.

"Q. Doctor, from the history given to you, examination,

treatment and your diagnosis would you have an opinion, based upon reasonable medical certainty, as to the competent producing cause of the injuries that the plaintiff complained of on or about October 28th, 1960—first, do you have an opinion? A. Would you restate the question?

"Q. From the history given to you, your objective findings and your examination and the treatment prescribed, do you have an opinion based upon reasonable medical certainty as to the competent producing cause of plaintiff's complaints and injuries? A. I do.

"Q. What is your opinion? A. I am of the opinion that the patient was injured in an automobile accident probably as a result of his automobile being struck by another.

"Q. What effect did that have upon any pre-existing condition or injury that the plaintiff may have sustained prior to that date? A. I cannot answer this definitely. I can only state that the patient was apparently getting along fairly well prior to his accident and the accident resulted in injury serious enough to hospitalize him for several days.

"Q. Now, Doctor, did you see the patient or plaintiff after he had left the hospital? A. Yes.

"Q. How many times did you see him? A. Well, approximately thirty times.

"Q. Did that include hospital visits? A. No, that is following the time he left the hospital.

"Q. What are his present complaints, Doctor? A. At the present time—let's put it this way: the last time I saw the patient was on 10-5-61 in my office. He was complaining of pain in the upper portion of the back and the neck and 'jammed' feeling in the shoulders and arms, both of his legs were still causing him trouble and he was still having frequent severe headaches.

"Q. Doctor, can these symptoms that you have described be recurring in periods of remission or exacerbation? A. Yes."

We find evidence in the record tending to prove substantial medical and hospital expenses being incurred by plaintiff and also loss of salary, amounting in the aggregate to the sum of $500 or more, which expenses and loss were undoubtedly given consideration by the jury in arriving at the verdict in favor of the plaintiff in the amount of $1,500.

In ruling upon defendant's motions for a new trial and for judgment notwithstanding the verdict and judgment in favor of the plaintiff, the court was required to follow the course as provided in Section 2323.181, Revised Code.

The provisions of Section 2323.181 pertinent here are as follows:

" * * * Such motion may be filed before or after, or simultaneously with, the filing of a motion for a new trial; and if both of such motions are filed, whether by the same party or by different parties, the motion for judgment provided for in Section 2323.18 of the Revised Code shall be first decided by the court. If such motion for judgment is sustained and judgment entered thereon, then any motion for new trial filed by any party shall, nevertheless, be considered and decided by the court, and if such motion for new trial is also sustained, the journal entry shall provide that a new trial shall be had only in the event of a reversal of the judgment on the motion provided for in Section 2323.18 of the Revised Code; if such motion for judgment is overruled, the court shall then consider and decide the motion or motions for new trial. At the discretion of the court, such motions of both kinds may be heard together or separately, but shall be acted upon in the order provided for in this section. * * *"

As indicated hereinabove, the trial court granted defendant's motion for judgment notwithstanding the verdict in favor of plaintiff as provided by Section 2323.18, Revised Code.

Following judgment for defendant notwithstanding the verdict in favor of the plaintiff, defendant's motion for a new trial was overruled by the trial court as authorized by Section 2323.181, Revised Code.

We reach the conclusion that there is substantial evidence in the record tending to support the verdict of the jury in favor of the plaintiff and that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict of the jury. *McNees* v. *Cincinnati Street Ry. Co.*, 152 Ohio St., 269; *Ayers* v. *Woodard, Sheriff, supra* (166 Ohio St., 138); *Durham* v. *Warner Elevator Mfg. Co.*, 166 Ohio St., 31. The judgment of the Common Pleas Court is reversed. Finding no error in the action of the trial court in overruling defendant's motion for a new trial, we determine and order that judgment be entered for

348

plaintiff in the sum of $1,500 as found by the verdict of the jury.

The cause is remanded to Common Pleas Court for execution.

*Judgment reversed.*

SMITH and FESS, JJ., concur.